Good morning. May it please the Court, I'm Robert Muse from the American Freedom Law Center. It's my honor and privilege to represent the plaintiff's appellants in this case, and I'd like to reserve three minutes for rebuttal. Now, this case challenges a public school district's restriction on a student's right to peacefully, passively, and silently express a patriotic message by wearing a T-shirt depicting the American flag on a public high school campus in California. On May 5th of 2010, defendants prevented plaintiffs from doing so in violation of the United States and California constitutions. Tinker v. Des Moines Independent School District controls this case, and Tinker does not authorize school officials to restrict student speech apart from its current or forecasted disruption due to the time, place, or manner of the student's speech activity, not its content. Now, there are a few limited exceptions to that general rule, and I'll address those momentarily, but a listener's or a viewer's reaction to speech is not a content-neutral basis for regulation. In fact, here's what the Supreme Court said in Tinker, quote, any word spoken in class, in the lunchroom, or on the campus that deviates from the views of another person may start an argument or cause a disruption, but our Constitution says we must take this risk. In fact, the court in Tinker, this is how they described the problem posed by the present case. Quote, the school officials banned and sought to punish petitioners for a silent, passive expression of opinion unaccompanied by any disorder or disturbance on the part of petitioners. The court was focusing on the manner of expression. Does the manner of expression cause a material or substantial disruption in the school? Certainly wearing a black armband, similar to just wearing a T-shirt with the American flag, is a form of expression that does not, by its very nature, nor could it reasonably be forecasted to cause a disruption or a disturbance, as opposed to, for example, using a bullhorn or walking around with placards or walking out of classroom. That form of expression would be a type of expression that may, in the unique circumstances of the school, cause a material or substantial disruption, but not the simple passive display of the American flag on a T-shirt. You're not saying that the school has no ability to control the content-based speech, are you? I'm saying in this respect, based on Tinker and the cases that have followed, there are limited exceptions that allow the court. And those are as follows. As I mentioned, I was going to address those. And they are here in many ways because here there were very concrete statements to the administrators that there was going to be some severe disruption that day. I mean, there was a concern, and even the principal or administrator went and addressed those individuals and very directly stated, I am concerned about your safety. Isn't that right? No. And let me address these where I think the content restrictions are, and then I want to get specifically, because I think it's important to drill down on what the facts are in this court. Are those not the facts? The principal did not come to the students and say that your shirt has caused a concern that there's going to be violence initiated against you. Am I wrong about those facts? This is the ---- Am I wrong about those facts? The school district, the school officials did say that as one of the justification. But let's look at what that justification, whether that justification is actually reasonable in light of what the facts are. No. That fact is correct, right? That fact is correct as a fact in the record, right? In the record, he said they were concerned about the safety and they were concerned that because it was their day, Cinco de Mayo, meaning the Mexican days, why do it on this day? Why are you wearing your shirts on this day? It was clear that the primary concern was the fact that they were going to cause a ---- cause discomfort or controversy with the Mexican ---- Disruption. Disruption. But it's not the kind of disruption that can be forbidden by, as I just described the ---- from what the Supreme Court said in Tinker. Now, let me just look. I want to address those facts about the, you know, the concerns of the violence. They cite several justifications. They say, well, the principal has witnessed several fights over the years between Hispanics and Caucasians. But none of those fights were related to a student wearing an American flag shirt. In fact, you know, my experience in public school, fights, unfortunately, are things that happen in the school. They talked about gang violence. There's not a shred of evidence that one of the plaintiffs was involved in any gang violence. In fact, there's not a shred of evidence, and it's just the contrary, that the American flag was associated with any gangs. In fact, they banned, they prohibited the students from wearing it on May 5th, but apparently they could wear it on May 6th. So there's no connection with the American flag shirts to the gang violence. The 2009 incident was probably one of the main things that they pointed to as to why, for what they were, they were basing their justification on prohibiting the shirts. Now, look at what happened in 2009. You had a Mexican student parading around with a Mexican flag around the campus, wearing it like a cape, and engaging in confrontational speech with other students. In fact, he said, F them white boys, F them white boys. And this student, that student was not suspended. That student was not even told to go home. And, in fact, that incident, according to Bowdoin's testimony, created five minutes of commotion. I really want to get back to the facts, because I — This is the — I'm sorry. Go ahead, Judge. On May 5th, my understanding of the record, and correct me if I've got a misunderstanding of the record, is that there were students going to the principal saying there is a threat of a physical altercation, there is impending violence by more than one student, and that a near-violent altercation had erupted during the prior Cinco de Mayo over the display. Is that wrong? I don't — I think that is a mischaracterization. I think there were students that were — that were concerned that there was — they expressed to the assistant principal statements such as, why do they get to wear their shirts this day? Why are they wearing them on this day? Something might happen because they're wearing these shirts on this particular day. But bear in mind, and you refer to the 2009 — and I want to go through this, because this is important. Despite what happened in 2009, and the principal said it was, quote-unquote, five minutes of commotion, no student was disciplined, no violence occurred, no classes were canceled, no classes were delayed. In fact, the day began and ended as usual in 2009. And yet, despite 2009, the Cinco de Mayo celebration in 2010 was approved by the school district. They're the ones that approved it. There's such — there's grave concern of this racial tension that occurs on Cinco de Mayo that we're going to tell these students. You know, we're not the jury, okay? So the real question is — and you make a strong argument. But the question really is, in light of Tinker, in light of the deference that the Court, in all its cases, even though they're in different contexts, has given to the schools to make this judgment, what, in your view, is the legal standard in which, you know, once they tip over it, then they go into unconstitutional territory? Because the Court has certainly given them a lot of deference. I understand, Your Honor. And I want to get back to it, because I think we're — when you look at what the exceptions are to that Tinker standard. Because if you look at — even look at Tinker, they said the students received hostile remarks, the ones that were in the black armbands. There's no question, were in the black armbands during that time in 1969, where other students had family members who were killed in the Vietnam War, that that was a very contentious and disputatious act. And yet, that wasn't sufficient enough for the Court to say, give deference to the school district. There's certain areas where they have. And that's where the content is allowed to be restricted. And that is sexually suggestive or lewd speech. And that is the Bethel v. Frazier. The speech advocating illegal drug use, which is the Morse case. Speech that is part of a school-sponsored event, which they kind of treat that as a separate category under Hazelwood. Speech that threatens violence, direct threats of violence, which this Court in Levine v. Blaine held was permitted to be restricted under Tinker. And speech that is considered racist. And this is where I think the closest connection of the cases that you can have to this are those Confederate flag cases. But the problem there is, those really — when you tease out the case law, those are really an exception that the courts created because of our longstanding racial tensions in this country. And in those particular school districts where they had that racial tension — and bear in mind, the Confederate flags were banned totally, not just on one particular day, Cinco de Mayo, because it's the Mexican students' day. So those — that's a category — Kagan. But I don't see why they aren't applicable. In fact, here, they're not saying that you can't wear American flag in general, but the school was saying, on this day, in these circumstances, with the racism floating around and with the verbal jabs and escalation being displayed, we're not going to risk having a blow-up here. So, you know, one day only, let's diffuse this and have everybody kind of go back to zero. What's wrong with that? I mean, do you have to wait until they basically duke it out in the courtyard before you can say, well, I guess they should have had them take off their T-shirt? Well, I don't think — quite frankly, I think that would be — that ruling would be contrary to Tinker. And the reason being, again, the — when you look at the overall — when you look at the overall facts, and the very fact that the school district was the one that approved this 2010 Cinco de Mayo celebration, and they didn't restrict the students who were engaging in their expressive dancing and so forth to wear the colors of the Mexican flag, but yet they restrict the students from wearing American flag shirts? I mean, it's — when you look at, in total, their main concern and you look at their specific statements, which I cited and quoted in the record, about them being concerned that it's their day. We don't want to disrupt on their day. You need to understand the importance and significance of their cultural holiday, that their concerns were very similar to the concerns that the school district had in Tinker that were found impermissible. And perhaps — I want to just go back to Tinker since — Yes. And I hate to be the district court judge who keeps saying, let me — give me the facts, but the facts here I think are critical, because Tinker says that that school official can restrict speech. It gives them the authority to forecast substantial disruption or material interference with school activities. CARPS gives us this case, again, that says they don't have to wait, as Judge McEwen said, until that disruption occurs. So factually, if that superintendent was told by students, something is about to happen in the courtyard based upon these shirts, and that was right before the teacher or the principal went out and conveyed to the student, I am concerned that you are at risk of being harmed because of this statement to me, and therefore, I'm going to require you to turn your shirts inside out. Isn't that precisely what the Tinker court said? We're giving you the authority to control the school environment to do. Well, Tinker says that schools can't be enclaves of totalitarianism. If you look at — he wasn't just saying it to security. He said to them specifically — I asked them, why today of all days? Why today? Why Cinco de Mayo? This is their day. I contend that the safety concerns is a pretext for the — for restricting based on viewpoint. So you're not disputing the fact. You're just saying that it had to be pretextual because of the day and what they were displaying on the shirts. What they're saying, that they allowed this event to happen, when you consider it in the overall context of what the particular facts were, their main concern was the view — was the — was a viewpoint restriction, not the safety issue. They allow them the very next day. What's the evidence of that? Look at their — Your Honor, I cited many of their statements that they made in the record. I'll run through a few of them. Well, while you're doing that, let's assume for the sake of argument it's not pretextual that they had — again, assuming for the sake of argument that, in fact, they had concerns about disruption. What then happens to your case? If they had — we assume they had legitimate concerns. Well, and the — again, under — under Tinker, as I — as I stated, the fact that there might be a disturbance, that is a risk that we take under the Constitution. I mean, that's — that is Tinker. That's not what Tinker — I mean, what Tinker said was the problem in Tinker is that the record fails to yield evidence that the school authorities had reason to anticipate that the armbands would interfere with work, school, or impinge on the rights. So the problem with Tinker is you didn't have that evidence. And Tinker says directly, schools can prohibit speech that might — here's a quote — might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities. That's Tinker, too. Right. And it says whether it stems from time, place, or type of behavior. And that's on page 513 where it's referring to. Right. And it's — 514. Quite frankly, the dispute might very well be with Tinker. I mean, perhaps, you know, perhaps Tinker was wrong. Perhaps Justice Black's dissent is where we should — where we should lie. I mean, that's what the defendant cited that time and time again. The problem is this is — this is Tinker, and Tinker does not allow this. And it's the Supreme Court that can change Tinker, not this Court. So what — for example, you seem to imply in your brief, and I think today in argument, I may be wrong, that it's okay for — acceptable for school districts to restrict gang colors. I — I think that you could — there's — that's probably an argument they can make there that there would be an exception for Tinker for gang colors. So — Which is — which is a unique — it's not a particular, you know, I guess, necessarily a viewpoint. I mean, those things are almost too generous, like the — like the Confederate flag. I mean, the Confederate flag, for many people, is considered a symbol of racism. And I think that the law — the case law treats it differently. But if there's no disturbance, what's the justification for restriction — restricting gang colors? Isn't the argument the same? I don't — I don't think the gang colors would be — would be akin to something like pure speech. I think it would be — it's — I mean, I'd have to think through how that would actually work itself out. But I think gang colors would be — could potentially be another exception, like the — like they've had for the Confederate flags, I think is probably a stronger argument for the gang colors because of the longstanding history and that they had a blanket ban on gang colors and not a particular viewpoint, meaning you can't wear your American flag shirt, but they can dance with their Mexican flag colors during Cinco de Mayo. So I think there is some distinctions between those that can very well be made that would allow the Court to reverse here and still not address the gang colors issue. All right. Your time has expired, but we'll give you some time for rebuttal. All right. Yeah. Good morning. May it please the Court, Don Willenberg of Gordon and Reese for Appellants Rodriguez in the Morgan Hill Unified School District. We live in a time and an age of school violence, and this case is about student safety, and it's about the leeway that this Court and other courts give school administrators to make reasonable decisions to protect student safety and about student clothing. Judge Kendall, you have the facts right. All of those things are in the record. All of those things are what happened. There are circumstances before Cinco de Mayo 2010, things that happened on Cinco de Mayo 2010, and things that happened after that day, all of which show that the administrators here had a reasonable forecast of some disruption. Well, if that's the case, then what about their equal protection argument that says that, you know, he let a couple kids stay, right? Remember? Or they went home. They didn't have to turn their shirts inside out. Is that it? Two of them were asked to either turn their shirts out or go home. One of them was allowed to go back to class, but decided on his own he was just going to go home anyway. He didn't feel good that day or something like that, right? Is that what the record says? That's that. And I'm a hothead sometimes, or in the record. Okay. The equal protection argument, though, is because these are not competing viewpoints. There isn't a viewpoint that is pro-America and a viewpoint that is pro-Mexico, and somehow these things are floating out there as competing intellectual Isn't it exactly that, though? I mean, the Cinco de Mayo flag is to be the pro-Mexican nationality, and then those students, I assume, who are wearing the American flag were saying Maybe it was an immigration issue. Maybe it was an anti- Who knows what the issue is, because when they were actually asked what the issue is, what are they doing here, the only thing that the student plaintiffs said was, well, we have a right to wear the flag anytime, anywhere, which is really pretty much what the argument is on appeal as well. It is to say that as long as clothing has a flag motif on it that is immune from any kind of other reasonable regulation, and that's not what's an issue here. A couple of things about the facts, though, are interesting, and that is, of course, the school puts it all in place by having Cinco de Mayo Day and deciding to have a celebration about Mexican origins, and it's also its flying flags, meaning the school, American and Mexican, right? So how is it that the school can fly those flags, but I can't wear one? Because when the school flies the American flag above the schoolhouse, it's not, in anyone's estimation, reasonably inciting people to violence. Here, however, there were reasons to believe that. Counsel, I think, misstated a little bit about some of what happened on the prior Cinco de Mayo, 2009, suggested there wasn't any confrontation involving the American flag. Well, actually there was. Actually, two of our plaintiffs were wearing American flag shirts that day, and both of them were not perhaps violently accosted, but were challenged by other students on the basis of just that. One of them had a Mexican flag waved in his face. So there was, in fact, in 2009, plenty of commotion leading to a possibility of more serious disruption, and it was based on these symbols. But I think it's naive to say that it's not a content-based display. That's what is actually causing the violence, or the concern for the potential violence, is that there are two content messages that are about to clash, right? Your Honor, I will go there and say, yes, it is content-based, but it's not viewpoint biased. And the reason for that is because the content is, of course, what's going to make it something that gives people the reasonable apprehension of a violent reaction. It is also true that it is that counsel seemed to suggest that you only look at the people who are giving the speech or wearing the shirt and decide whether they are peaceful or not, and that's the end of the analysis. Well, that's not true under any number of cases. Tinker didn't actually necessarily confront that as much as others. The cases regularly look at, well, what is the likely effect on the audience, on the speaker? I mean you're not suggesting, are you, that absent any indication of past violence or prediction of current violence, that the school district could take this action, are you? If you take disruption out of the equation, plaintiffs are right. Wouldn't you agree? Yes. And but in fact, of course, you can take the prior disruption of the other things out of the equation. Well, but then that leads me to my second question. This is summary judgment. So we draw the inferences in favor of the plaintiffs here. We've heard a lot of gloss on different facts that I think are pretty well undisputed, but the plaintiffs are essentially claiming pretext here. Why isn't that a jury question? I can't answer that. In other words, if in fact the school district's actions were pretextual, why isn't that susceptible to a factual determination as opposed to a legal determination? There's virtually no evidence of pretext. Every statement made by the plaintiffs is a pretext. See, now you're arguing about the facts again. I just say, if in fact, assume hypothetically that they've got evidence of pretext, why is that appropriate to resolve at the summary judgment stage? I guess the only way they could have evidence of pretext is if they could demonstrate that all of the or had evidence that the evidence of potential disruption was made up. If it had been made up, absolutely, then this would be a jury question, then they could go there. But there isn't any evidence of that in the record. I think there's theory, or one theory, although they haven't articulated it this way, is if you establish a certain day where you're allowing speech, and this is pro cinco de mayo, that in fact you're creating a limited public forum in which you have to tolerate other speech, which is against the speech that you've created for the public forum. In other words, to put it in another context, if you have a tolerance day, you have to endure the views of anti-tolerance. Your Honor, no one was prevented from expressing views on this day. No one was told, you can't have a conversation about immigration. You can't have a conversation about cinco de mayo. No one was, by the way, ever disciplined for wearing these clothes on this day. No one was prevented from wearing these clothes on any other day. In fact, they wore them earlier. Do you think that if the school had issued an edict after 2009 and just before the 2010 celebration, which said basically leave your American flag clothes at home, would they have done that? I think so, Your Honor, though the case would, of course, not be as strong as it is here today because that sort of stops the mourning of cinco de mayo 2010, whereas in this case, we have additional threats communicated, the actual mourning of, and additional threats that came in for the next couple of days, threats that people took seriously enough that one of the plaintiffs stayed home two days later. Why? Because his parents and the police suggested that he do. If his parents and the police think that there is that much threat of violence at the school, then doesn't that confirm, almost beyond dispute, that the school administrators were reasonable in making a forecast of potential disruption? You know, Karp frames this analysis, which is probably why plaintiffs avoided so much and try to torture Tinker into saying things that Tinker didn't get to say and confronting issues that, frankly, Tinker didn't have to issue. What does Karp say? It says the temptation to be a Monday morning quarterback should be resisted, and instead, we should look on whether there's a reasonable apprehension under the circumstances. And then Karp goes on and tells us, well, how do you determine whether it's a reasonable apprehension? The first thing is you don't have to wait until disruption actually occurs. In fact, there's a duty to prevent disturbances. School administrators were fulfilling that duty. Second, Tinker doesn't demand a certainty that disruption will occur, only facts which might reasonably lead school officials to forecast disruption. Third, because of the State's interest in education, the level of disruption doesn't have to be as high as it might be, as they say, on a street corner, which would be my response to plaintiff's argument, well, what happened in 2009 wasn't really so bad. No one went home. No one got bloodied. School didn't have to let out early. Well, that's great. So the same school administrators who intervened in 2009 and diffused that situation, how? By removing the student who seemed to be the most troublesome at the time, and that's what they did the next year, too, not because the students were troublesome, but because what they were doing, what they were wearing was putting them and other students at risk. If a fight breaks out in schools, and it isn't necessarily just between the two who started, who knows what else will transpire. I'd also say that there's probably a fourth element that has come since Karp and Levine. It's in the Confederate flag cases, it's in Morse, it's in DeFabio, and that's the plaintiff's personal interpretation and purpose are largely irrelevant. What you're looking at is how is the message likely to be understood. Rodriguez and the school administrators thought, you know, last year there were some problems with flag shirts and flag demonstrations. Last year we had some students saying, F them, white boys, F them, white boys, let's F them up. You know, I think that's good enough for a principal to say, I'm concerned about this, and I want to take some act to allay that. Again, what's the act? To answer Judge McEwen's question earlier, then you would say, under Karp, you think it's okay to do that content-based restriction of the American flag shirts before this 2010, just based upon those statements that, you know, we're going to stop disruption in the future. Isn't there, is there a continuum that we're supposed to be looking at for the reasonableness of the administrator's actions, which would show the court that they were actually in fear of a real disruption? You know, of course, counsel's arguing it's all pretextual. There was never any real violence that was going to occur. They were just doing this to restrict the speech. That just flies in the face of what actually happened in this case. That's not what the administrators said at the time, and it would ignore the fact that these students actually did get threats. It would ignore the fact that the next day, the day after Sancto Domingo 2010, there was a lot of commotion at school. And I'm not blaming that on the fact that they wore the shirts, although that's all part of the causal chain. And during that, there's undisputed evidence that some students were yanking an American flag out of the hands of a man in a wheelchair. Now, if there's that much negative student response to flags on that day in that context, that seems, again, to me, to just confirm that the school administrators the day before were completely reasonable in forecasting that there would be some sort of disruption if the shirts were worn on campus in this place on that day. What level of disruption do you think triggers the tinker exception? Because provocative free speech often provokes, shall we say, some disruption. The black armbands and tinker by themselves were considered by some to provoke some disruption. I think it involves whether there are groups involved. I think it involves whether there's a potential for physical violence. And both of those are present here. Both of those, I understand that you might be able to parse the facts and tinker and say to yourself, well, independently looking at them, maybe it's similar, but in fact, the courts there said, no, there isn't evidence of a substantial potential disruption. And in here, we have all kinds of evidence that there was a potential disruption. Thank you. If what you had was basically a verbal melee, but no physical violence and touching, but basically huge disruption and you got this one student over here and a group of students over here and another one over here, and there's just all kind of yelling and screaming, would that be enough disturbance to say, halt, take that flag off? Well, that might be because that sounds like it might be enough that they would actually not be in class, which we certainly would. Well, okay, so in other words, just — I don't think that you have to — I think that if you have a fight in between periods, it's just as bad as if you are — I didn't say a fight. I said a verbal, you know, shouting match. So the question is — Sort of like you see on Crossfire. Can these administrators say, okay, it didn't get to fisticuffs this time, but this is a bad situation. It's a volatile situation. I'm in a school that's had a history of racial tension, and I'm not going to let it get to the next place. There's — we hope that all the cases that we have on this are cases where the school administrators stepped in too soon. I guess those are the constitutional cases, because when they step in too late, then we get the tort suits for you didn't protect the children, you didn't take the right acts. I see my time is up. Any further questions? No. Thank you. Thank you. We'll give you two minutes to rebuttal. Well, thank you very much. It's very kind. Obviously, Tinker — what is the standard? Tinker says material and substantial disruption. And again, you look at the facts here. You had five students that originally pulled from the classroom, brought into the principal's office. And I cited in the brief quite clearly the different statements I made about this being their day and why this day and so forth that I went through already in my opening argument. But out of those five, they turned around and let two of them go back to the class. And then even in that period when they were approached by the assistant principal, the students had been on campus for over three hours. They'd been to two classrooms, and they'd been to homeroom period, and they'd been no problem. And if there was such this grave concern — and this, I think, really goes to show how unreasonable the school district was — if there was such grave concerns about Cinco de Mayo and about this clash between the Hispanics and the Caucasian students on class, yet they went ahead and approved — and this was a student event — they approved the Cinco de Mayo celebration on campus. If they truly — Here in California, we say Cinco de Mayo. Cinco de Mayo. So they approved Cinco de Mayo's celebration on the campus, apparently having all these grave apprehensions and forecasted fears about this, you know, violence that's going to erupt based on 2009, but they still allow it, and they allowed the students — the students were the ones that sponsored the group. And this goes to the point, Judge, that you made about with the equal protection. And also, I think, Judge Thomas, with the content — in fact, I would argue this is viewpoint discrimination. Because if you're allowing a segment of the student population to engage in what is truly — I mean, that's free speech activity, having the Cinco de Mayo celebration with expressive dancing and wearing the colors of the Mexican flag. That's a form of expression, expressing their national pride, which is what the purpose of the Cinco de Mayo was. But yet, you're telling these students they can't wear — passively wear an American flag shirt to school on that same day, because all of a sudden now, for them to wear that flag shirt, there's going to be this huge disruption. But with these students having this celebration on campus at a time that apparently that's fine and it's reasonable and allowable for them to do that, that's why viewpoint discrimination is the most egregious form of content-based discrimination, and why here, this is a tinker case, and why this is a violation — this is a viewpoint discrimination. And when you look at the totality of the facts, it was unreasonable. And the last thing I would add is relying on these post-event threats of violence would be improper. And the reason being is — the reason why there was these post-event threats was because of the publicity, that this really inane decision by school administrators to ban the wearing of an American flag shirt on an American public school, it went — I mean, it went viral on the Internet, it went viral in the media, and it was because of the — it was because of the very controversy that they created that then caused this later controversy with the individual grabbing the flag out of the man in the wheelchair and all the other — the actual threats of violence came post-event, and that was because they created the very controversy by banning the American flag. And I can't then rely on that to justify, again, what I believe to be the pretext to prohibit their speech, the pro-America speech on Cinco de Mayo, which is viewpoint discrimination. It violates the First Amendment, and it violates the Equal Protection Clause. Roberts. Thank you, counsel. The case just heard will be submitted for decision. Thank you for your arguments.
judges: Kendall, Thomas, McKeown